May it please the Court. My name is Walter Walker. I represent the Davila family, the plaintiffs in the underlying case, the appellants here. And if possible, I'd like to reserve four minutes of my 15 minutes for rebuttal. You may, but you have to help keep track of your own time, because that's the full time remaining. All right.  Now, standard law. To grant summary judgment, a court must determine there are no genuine issues of material fact. In this somewhat unique situation, we had two law enforcement agencies simultaneously bringing motions for summary judgment. They were brought together. They were heard together. And these two law enforcement agencies had conflicting positions and interests. The district court responded to these conflicting positions and interests by making findings of fact. The city of Tracy and its officers said that the decedent, Mr. Davila, was so drunk he could not speak in any recognizable language. He could not stand up on his own. He did not know who he was. He did not know where he was. And he could not make basic decisions. The county of San Joaquin and its officers said that there was nothing remarkable about Mr. Davila at all. They said there was no reason why he needed any attention, no reason why he could not be discharged into the elements at 1.30 in the morning. Tell me, who are the defendants that are still in the case? City of Tracy and officers Flores and Harries. And the county? They were the arresting officers. The county is no longer here. No. Because what happened was the judge, in making his findings of fact, decided that the city of Tracy and its officers were entitled to summary judgment, but that the county and its officers were not. The county then took its matter up on appeal, claiming that its arresting officer, excuse me, booking officer, was entitled to immunity. And the matter settled on appeal. So we're just here with respect to Tracy and its officers. Now, with the- What is your, I hate to jump ahead here, but what is your theory about the cause of death? There was a physiological stress on this damaged man, who was allowed to go out into the elements when it was 40 degrees at 1.30 in the morning with no protective clothing and no way of getting home from a place where he was 10 to 18 miles away from his home, where he had been taken by the city of Tracy police officers. Right, I understand the events leading up to it, but what is your theory of why he eventually died? Hypothermia? Hypothermia. Or diabetic related? I personally don't think that the diabetes caused his death. And the coroner, who was an agent of the county, and who, frankly, just did not do a very good job, didn't appear to put much effort into it, didn't give us anything that would assist us in that regard. It does appear that he had some heart condition unbeknownst to him, which becomes very similar to the Gibson situation, and that he would have been exposed to the elements long enough to have suffered hypothermia. And whether the hypothermia exacerbated his heart condition or his heart condition made him more susceptible to hypothermia, the fact of the matter is he was out in a place where he shouldn't be and where he wouldn't have been but for the actions of the city of Tracy and its officers. Now, when you say but for the actions of the city of Tracy and its officers, this gets to be confusing because he was taken to the county jail. And it was the county that released him. So your position has to be that the wrong on the part of the city who took him to the county jail is the cause of his death how? Well, it's a contributing factor. And that really is the nut of the matter, isn't it? Yes. It goes like this. We do not challenge the discretionary act of the city of Tracy's officers in arresting Mr. Davila. They felt this man needed help. And in fact, they have said repeatedly and to a person, each one has said, he couldn't be left on his own. He needed help. They thought he was drunk? They thought he was drunk. They didn't know whether he was drunk. They thought he was drunk. The evidence doesn't seem to me. According to the record, they took him to the place that they thought could better deal with drunks. Well, that's where we get to the heart of the matter. They arrested him. And then even though they said that he was in this desperate situation, even though they described him as being unlike anybody they had ever seen before, talking in a non-discernible language, just making grunts and noises and unable to stand up on his own, saying he clearly needed help, they then did just what they did with any run-of-the-mill drunk. They took him to the county jail. And what they should have done, given the fact that he was, if, in fact, drunk, super drunk, they should have taken him to the hospital. Super drunk is a phrase they use, by the way. They should have taken him to the hospital rather than to jail. For a medical clearance. One of two things. Either they supposedly had a policy that if someone was super drunk, that person gets taken to the hospital for medical clearance. They didn't do this. That either meant that the police officers didn't care, or it meant that there really was no such policy. But the alternative was, if they were delivering him really to the county facility, to the jail, where he was to get treatment, then they had to tell the jailers what it is they observed. Because here's where we get into the other part of the fact situation. The jailers say, hey, he gets here about 32 minutes after you arrest him, and there's nothing unusual about him. We don't see anything that causes us to believe that he's got a medical condition or that he needs any special treatment. So we don't provide him with any special treatment. We just do as we always do. Our policy is you take in the kick-out drunks, the run-of-the-mill drunks, and you discharge, you let them sit in the lobby for six hours, and then you discharge them. Well, in that instance, they discharged him into the night, 1.30 in the morning, far from home. That was the discharge. Yes. But my question is the other way around. I guess I'm having trouble. What you say, it may have been negligence not to take him to the hospital for a clearance first and to deliver him to the county. But I'm having trouble seeing where there's a violation of his Federal rights in connection with their taking him to a facility that they believed was better able to take care of people who had his condition. I don't know that I'm not following. Once they decided to arrest him, that's where we pick up our allegations. He now was totally in their control. They announced that the reason they arrested him was for his own good. It was now totally dependent on the arresting officers to do something for his own good. And they didn't do it. They exercised deliberate indifference. One, they didn't take him to the hospital, which was one of their options. Two, if they were taking him to the jail to get medical treatment, they had to tell the jailers this man has a special condition. He needs medical treatment because it is an undisputed fact that he did not get any medical treatment at the jail. Was his condition different when they took him to jail than it was when they arrested him? That's a question of fact. That is what should have been determined by a charge. But what's your theory? I mean, if the county were still on the case and the city were still on the case and you tried the case, what's your theory about his condition at the jail? My theory is, Your Honor, the condition at the jail is what his real condition was when he was arrested. There was something wrong with Mr. Davila, but he wasn't drunk. And we have a videotape of him being processed at the jail. That was before the court as well. And he just looks like anybody else. He's following orders. But supposedly, at some time between 6-08 and his delivery to the jail at 6-50, he was, according to these police officers, talking in tongues, falling down, totally glossed over. He didn't know where he was, what his name was. He was only half a dozen houses away from his own house but had no clue where he was. He thought he was in these other people's house. There was something wrong with him cognitively. He did need help. He needed some kind of treatment. He wasn't provided that. Once the officers took him into custody, they were in total control of him. And it was incumbent on them to do something with him and not just say, okay, we're passing you on to somebody else and now you're somebody else's problem. What's the closest case that you have to this situation? It is definitely the case of Gibson v. County of Washoe, which is 290 F. 3rd, 1175. Of course, it's a Ninth Circuit case. And I would also like to point out the case of Geraldo v. California Department of Corrections, 168 Calat 4th, 231. And there, it was established that there is a well-established special relationship between jailers and prisoners that is equally applicable to officers of the law who take arrestees into custody. And Geraldo said, quote, it has been observed that a typical setting for the recognition of a special relationship is where, quote, the plaintiff is particularly vulnerable and dependent, close quote, upon the defendant who correspondingly has some control over the plaintiff's welfare. And that's Geraldo 168 Calat 4th at 245 to 246. But your argument is that it was okay for the plaintiff to take him to the county jail as long as they communicated his condition, right? Yes, Your Honor. OK. So the only, and that's what they did, they took him to the county jail. So I understand there's the other alternative. But we're down to basically what they communicated when they arrived. That's your theory of liability. And there's no doubt they communicated nothing. If you look at page 13 of defendant's supplemental appendix of the record, you will see the processing form that they filled out, where all they did was check off the form saying that he was a drunk. Yeah, it's the San Joaquin County, California booking slash arrest report. And at the bottom of the page, it is in pre-printed type misdemeanor incarceration. And there are nine different categories. Number one said, the person arrested was so intoxicated that he could have been a danger to himself or others. That's checked off. Number two is, the person arrested required medical examination or medical care or was otherwise unable to care for his own safety. That is not checked off. It is left alone. Yet the officers claim that's why they arrested him. They didn't want to arrest him in the first instance. The person who called into the police, made the 911 call, was a neighbor. And when she understood who he was and that he thought he was in his own home, she said, I don't want to press charges for trespassing. The officers then tried to go to his home and deliver him to the family, simply because he was in such bad shape somebody needed to take care of him. But there was nobody at his home. So it was at that point that they made the decision to arrest him. But because they arrested him, as they have said, for his own safety, they had to do something for his own safety. He was now totally dependent on them. They put him in a worse situation than he was in before. If they felt that in his own neighborhood, on his own street, it was unsafe for him to be there, or that it was unsafe for him to be in his own home, what were they doing taking him to a rural jail that was some 10 to 18 miles away? And there are varying stories as to how far it was. Where the standard policy was, and should have been known to these people who are always taking their run-of-the-mill drunks there, that after six hours, they are simply expelled, simply kicked out. That's the term they used, kicked out. So here's a guy who desperately needs help. And they put him in a situation where he is going to be exposed to the very thing that they said they were trying to protect against, which is he didn't know where he was, and he couldn't make basic decisions. So he was going to wander off. And what happened? Exactly that. After six hours, he was expelled in a place where he didn't know where he was, and he wandered off. Judge Schroeder, you have a puzzled look in your face. Now, I just think this is all the fault of the police officers who brought him there. I just don't. It's not all their fault. It was partial. They played a role in it. I don't have to prove it was all their fault to keep them in the case. And what we really have on appeal right now is not the ultimate merits of the case, but whether summary judgment should have been granted. And in this instance, the judge in the district court declared Mr. Davila was drunk as a lord. And back to you, Judge Thomas, what is my ultimate theory in the case? My ultimate theory is he wasn't drunk. The only evidence that all the attorneys could get from all the research they did was that he had had one beer. And they didn't take any blood alcohol test, and the coroner didn't find any evidence of alcohol in the system when he did the autopsy. Judge, about a minute. Okay. You've just about used your time. Have I? Yes. Okay. Thank you. We'll be generous and give you two minutes. Thank you, Your Honor. Thank you. Good morning. May it please the Court. My name is John Whitefleet. Excuse me. And on behalf of the defendants, Sasha Pelley's, the City of Tracy, California, and City of Tracy officers, Harries and Flores, we ask this Court         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  administers amendment assures plaintiff's constitutional rights without judgment in their favor. In essence, plaintiffs fail to establish every element of deliberate indifference to the decedent's medical or mental needs under the 14th Amendment. And that's why affirmance should be granted. In addition to the causation issues, and ultimately, that this is not on behalf of the estate or behalf of the administrators of decedents, but for plaintiff's own familial association rights, which ultimately the officers accounted for by first attempting to take him to home, finding no one at home to be able to take care of him, brought him to a jail that had facilities, medical care facilities, which plaintiff must concede that he was seen by medical personnel immediately upon booking. So ultimately, the question is whether there was — What's your theory of why he died? The coroner is clear that he had hardening of the arteries. Well, he did, but you know, the diagnosis of arrhythmia leaves no physical trace. There's no precise cause of death that could be directly attributed in the coroner's report. He's just speculating, isn't he? I mean, there's no evidence of heart attack. I don't see it in here. When he says arrhythmia, that means that there's a sudden electrical event which doesn't leave any traces. There's no blood alcohol reported, so he's not drunk. The only thing that's remarkable is that he's got a very low glucose factor, which would indicate that he's probably had a diabetic episode on the low end, and that would be consistent with his confused state. So either you have a guy who's — I mean, and nobody says he had anything to drink, so either he had a guy who was — he was in dementia, and maybe it's true, or he was in a low — he was in a low diabetic state and wasn't making any sense, either which is a medical condition, right? It may be — The best interpretation of this evidence? No, Your Honor, in essence, because there's no expert testimony that states that the symptomology that the officers observed was somehow meant to, or should have been recognized to the officers as having a diabetic episode. And in fact, the — Well, I'm in dementia. It doesn't make any difference. I mean — No evidence of dementia. Well, he's speaking a language that — One minute, he's speaking a language that nobody can understand. He's grunting, he's screaming. And the next minute, 30 minutes later at the — at the booking station, he's fine, or at least he's compliant. And that counts against — Something is going on — something's going — I mean, to me, when I look at this whole thing, something's going on medically with him. There's — there's no doubt about it. Now, the officers may have been reasonable in thinking that he was intoxicated, but it turns out he wasn't. And — but that's exactly our point, Your Honor, is that officers had every reason to believe that the symptomology that they observed was indicative of being intoxicated. The inability to communicate or acting strangely is entirely consistent with somebody who doesn't want to essentially admit that he's intoxicated or doesn't realize that he's in somebody else's house. We don't know what's going on in his head.  he's in somebody else's house. So they've either — they know there's a medical problem. They tried to take him home. I mean, my — I think the best case, if you're on summary judgment, is that they didn't check off the medical form on the booking and didn't communicate that this guy has some severe symptoms. Because if — it is sort of like looking at night and day from the county's point of view and the city's point of view. The city's point of view is, boy, this guy is in serious shape, and we took — we had to take him somewhere. The county's point of view is, look, he seemed fine to us. And it is kind of hard to reconcile unless there's something medically going on, and then you get down, is there a tribal issue fact on failure to communicate? I think that's where I am in this case, and that's what I'm interested in. And, Your Honor, ultimately our position is there's no evidence that is submitted in support of the summary judgment to establish that there's some connection between this inability to communicate and something — some medical or mental condition that these officers should have recognized and failed to recognize. And there is no evidence of that, ultimately. And so that if plaintiffs are now bringing forth an argument that says, well, really the case is about that they should have told the county officials of this additional information about, well, we couldn't get them to communicate a half hour ago, number one, that's not in the complaint. Number two, they didn't argue that in opposition to summary judgment motion. I couldn't find that in the district courts. It's not in there, Your Honor. Where's your best evidence on what they told the booking officer when they brought him in? I don't believe the record contains what was told to the jailers, or what wasn't told to the jailers. Ultimately, the evidence shows that he was booked in, he was cooperative, that a nurse saw him and purportedly answered questions, purportedly didn't answer questions. Their theory was those questions were improper. That's not attributable to the city. It defies, in our position, it defies logic that a city can take a person who appears to be inebriated to a county facility that has medical care available. I think the only point here is that it's fine to do that if you tell him what's wrong, whether he's super drunk. I mean, there's a whole disconnect for me between somebody who is so either intoxicated, turned out he wasn't, but he can't communicate at all. He's in the wrong house, he's grunting, he's making no understandable human noises. And then if you just dump him, which I doubt that they did, but the record doesn't seem to show one way or the other, and they put him in the booking and say he's drunk, and then leave without telling him that this guy really needs help. I mean, the record seems silent on that. I just don't know. But it says, according to the district court, the officers delivered Davila to the San Joaquin County Jail at approximately 6.50, transferred his custody to the county sheriff. Now, that's in the incident investigation report. Is that a city report? There is a city report, yes, where one of the officers transported the decedent, once they tried to find a family who could take care of him, finding no one at home, took him to the jail. And there is that lapse of time between the time they found him in the house and the time that he was- Right, but I'm just reading from the district court's decision where the district court says that the officers delivered him to the county jail at 6.50, and then at approximately 7.30, Defendant Officer Thomas Kendrick began Davila's pre-book process. Is Kendrick a city police officer? No, that's the county. That's the San Joaquin County booking officer. And then there was a medical health screening to the on-duty nurse. That was the mental health screening done at the county jail? Correct. And the questions attached were phrased so that if any questions answered yes, an on-duty nurse will review the screening and determine if further attention is required. And it says that the screening transmitted, Davila said that Davila answered yes to a question regarding whether he had been drinking that day. That's really all we- And ultimately, Your Honor, I believe the point is that there was a medical screening, there was competent personnel at the county. There's no evidence- They treated him as being drunk. I'm trying to- And he stayed there for six hours without apparent incident. And this is their, what I'm trying to understand is they got him, they did a screening, they treated him as if he were, they apparently treated him as if he were drunk. They didn't, there's no evidence that they excluded in their screening process, or such that the city would have known that they would have excluded a medical screening process simply by saying we're processing this person as a public intoxication. The point is, what information, if in fact, plaintiff's argument is, well, this was such an obvious medical or mental need, is of what? And there's no extra testimony of what? Except to communicate the symptoms. That's the, I mean, I think that's the best case, is that, and they may well have, it's just not in the record, but I can see, and you may correct me on this, that they communicated fully his symptoms, that they found him in this house, he couldn't speak an intelligent language. I mean, the odd thing about it, I mean, there's no blood alcohol in the system, basically, on the autopsy report. And that's consistent with him having a beer and waiting six hours. But what is significant is that his blood glucose is at 18 milligrams under 70, is considered severely high. And there's no evidence, your honor, that he was suffering from the acidosis. No, that's highly, that's high. Let's see, that's a high blood glucose. Acidosis, ketoacidosis would be something in the 200 to 300 milligram. And that's when you go into a coma. If it's below 70, that's the opposite reaction. That's hypoglycemia, not hyperglycemia. So, I mean, normal 70, he's at 18. He's in a bad shape. At least according to the autopsy report. And there's no evidence that he was in that state at the time he was arrested versus the six plus hours he has spent at the jail, plus the additional time he spent. Do police officers normally take blood? My understanding, your honor, is that's done at the jail. What shape he was in. Yeah. And so ultimately, your honor, there's no explanation that, in the record, that those findings, many, many, many hours afterwards, were somehow, that these officers should have recognized as some sort of medical condition at the time. So that they should, and then that they should have been aware of that and then failed to act on that. We're looking at hindsight, and I'm looking at this record, and the officers didn't know all this. I understand. I mean, I think the best theory, and that's the one that I think you've explained it as well as you can, and I think it's, the county has a different liability, is that the best theory the plaintiffs have is that there was inadequate communication of the symptoms that he experienced. Your response is, look, we took him in, there was a medical person there, and they filled out the form showing he was drunk, right? That's enough. In essence, your honor, the other aspect of that is there's no connection between what the county, what information that the county officials should have had that would have led them down to a different path or a different road. So there's no, there's a disconnect between what the officers should have said and what could have been said that ultimately the county would have said, aha, but there's no evidence of that. And regardless of that, there's the causation issues on death that there's no evidence that the symptomology that the officers observed was somehow ultimately attributable to the death and briefly on the Monell issue, since plaintiff's counsel didn't address that, the point on the Monell issue is they concede there was a policy to consider whether the inability to communicate was a factor and whether the person should obtain medical care. If in fact, that these officers did not consider that, which we're not conceding, but if their position is that's what it is, then clearly, then the policy was not the moving force behind that violation. Therefore, Monell, there cannot be a Monell issue. Briefly on the state cause, state claim for negligence, we believe that the government code section 820.2 clearly provides immunity for the discretionary acts. We believe the evidence is clear on the record that the officers considered the factors, made a discretionary decision to bring him to the jail. And on that basis, unless the panel has any more questions, we'll submit. Are there any further questions? No questions here, thank you. Thank you. Thank you. Judge Schroeder, could we take a recess before Johnson's argument? Yes. But we'll give the appellant his one minute and 13 seconds that's been stretched to. Judge Schroeder, my two minute drill, I'll put it to best use. I must first take issue with something my learned colleague said. He's made a factual error on two occasions. It's the same one. He said that Mr. Davila was seen by medical personnel at the jail. He was not. That's our point. He said a nurse saw him. No nurse saw him. That is our point. A nurse should have seen him if in fact those police officers were carrying out the very mission they claimed to be on. And then secondly, Judge Thomas, with respect to what it was that was wrong with Mr. Davila, this issue came up in the oral arguments before the district court and the counsel for the county said, plaintiffs in this case have never even identified what serious medical need Mr. Davila had at the jail. Theirs. And the judge cut her off and said, the problem with that argument is yes, they don't because nobody called the doc. If there is a lacuna in the evidence, it is your problem, not theirs. And that's exactly the situation. The Davila family whom I represent were not there when he was arrested. They were not there when he was booked into the jail. They were not there when he was released. They cannot say based on their observations what was wrong with him. We must rely on what the police officers say and what the jailers say. And those are two different things. Was there a history of dementia? Yes, there was. There's a mention in the medical records of dementia. I saw that mention, but there's no family testimony on that one? There is family testimony that he had wandered away from a brother's house in Houston saying he was going to walk back to his home in Tracy. Okay. Now, all of this should have been sufficient to go to a trier of fact, but the Court declared Mr. Davila was drunk as a matter of fact, and the Court cast all inferences in favor of the arrest of the officers. Where are you, where do you say that? This was in the oral arguments, Your Honor. He said he was drunk as a lord. That was the opening statement that Judge Carlton made. And, you know, that unless you're reading Puget Woodhouse, you probably don't know what that phrase means, but I would submit that in this day and age it means the same thing as super drunk. I take it the argument was before the order was issued. Well, it always is. But may I just say that, Judge Schroder, you asked about cases that are relevant, and certainly the Supreme Court's decision in Anderson v. Liberty Lobby was relevant 477, or is relevant 477 U.S. 242, where the Supreme Court said credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. You're familiar with the principle. Thank you. You have used your time. That did not happen here. Thank you, Your Honor. The case discharged is submitted for decision. Before the Court hears the last case, we'll take a 10-minute recess.
judges: Schroeder, Thomas, Gould